**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

ALBERT GUTKNECHT, individually and on behalf of all others similarly situated,

Plaintiff,

v.

THE LOVESAC COMPANY, SHAWN NELSON, and DONNA DELLOMO,

Defendants.

Case No. 3:23-cv-01640-KAD

**AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

**JURY TRIAL DEMANDED**

**TABLE OF CONTENTS**


I. NATURE OF THE ACTION ........ 1

II. JURISDICTION AND VENUE ........ 4

III. PARTIES ........ 5

IV. SUBSTANTIVE ALLEGATIONS ........ 6

A. Lovesac's Finance Function Was Chaotic with No Effective Internal Controls, Resulting in Inaccurate Reporting ........ 6

1. Background ........ 6

2. Confidential Witnesses ........ 7

3. The Confidential Witnesses Described, and Lovesac Admitted, That the Finance Function Was Characterized by Turnover, Disorganization, and Chaos ........ 8

B. Lovesac Violated GAAP by Improperly Accounting for Shipping Expenses...... 13

C. Lovesac Improperly Accounted for Leases ........ 17

D. Lovesac Improperly Recognized Revenue ........ 21

E. Lovesac Improperly Accounted for Inventory and Cost of Goods Sold ........ 24

F. Lovesac Improperly Classified Cash Flows ........ 26

G. Restatement and Materiality ........ 28

H. Lovesac's Ineffective Internal Controls Over Financial Reporting ........ 32

I. False and Misleading Statements During the Class Period ........ 36

J. The Truth Emerges ........ 46

V. PLAINTIFF'S CLASS ACTION ALLEGATIONS ........ 48

VI. APPLICATION OF PRESUMPTION OF RELIANCE; FRAUD ON THE MARKET ........ 50

VII. COUNTS ........ 52

VIII. PRAYER FOR RELIEF ........ 57

IX. DEMAND FOR TRIAL BY JURY ........ 57

1. Lead Plaintiff Susan Cooke Peña ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding the Lovesac Company ("Lovesac" or "Company"), analysts' reports and advisories about the Company, consultations with accounting experts, interviews with former Company employees, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

2. This is a federal securities class action on behalf of persons and entities that purchased or otherwise acquired Lovesac common stock between June 8, 2022, and August 16, 2023, inclusive (the "Class Period"), seeking to recover compensable damages caused by Defendants' violations of the Securities Exchange Act of 1934 (the "Exchange Act").

3. On August 16, 2023, after the market closed, Lovesac, a company that designs, manufactures, and sells furniture, disclosed in a current report on Form 8-K with SEC that investors should no longer rely on its previously issued financial statements contained in its Form 10K filed on March 29, 2023 reporting its financial and operational results for its fiscal year ended January 29, 2023,[1] ("2023 10-K"), management's report on internal control over financial

[1] Lovesac's fiscal year ends ends on the Sunday closest to February 1.

reporting for the fiscal year ended January 29, 2023, and its Form 10-Q filed on June 9, 2023 reporting its financial and operational results for the quarter ended April 30, 2023 (the "1Q24 10-Q"). In that 8-K, Lovesac disclosed that the planned restatement was the result of an investigation that the Audit Committee (the "Audit Committee") of its Board of Directors ("Board") had commenced resulting from the discovery of a recorded journal entry in the quarter ended April 30, 2023 to capitalize $2.2 million of shipping expenses that related to the fiscal year ended January 29, 2023. The investigation had identified errors with the methodology used by the Company to calculate the accrual of its last mile freight expenses applicable to the Company's financial statements for the fiscal year ended January 29, 2023 and the thirteen weeks ended April 30, 2023, which caused it to overstate previously reported operating income and net income. The Company also disclosed that as a result of these errors, it was likely to identify one or more material weaknesses in its internal controls over financial reporting.

4. Following these disclosures, Lovesac's stock price fell $0.70 per share, or 2.95%, to close at $23.06 per share on August 17, 2023.

5. On November 2, 2023, Lovesac filed an amendment to the 2023 10-K on Form 10K/A with the SEC ("2023 10-K/A"), restating its financial results for the first three quarters and full 2023 fiscal year.[2] In the 2023 10-K/A, Lovesac explained that the Audit Committee's investigation "concluded $2.2 million of last mile shipping expenses relating to the fiscal year ended January 29, 2023 were improperly capitalized during the quarter ended April 30, 2023." More, "the methodology used to estimate an accrual of last mile freight expenses at each period end was not accurate because the calculation did not use the correct number of shipments that were

[2] The 2023 10-K/A also contained revisions to the Company's 2022 fiscal year financial statements.

accepted by the shipper for delivery, but not yet invoiced to the Company." The Company also restated its financial statements to record adjustments to correct certain misstatements related to its operating leases, recorded an adjustment to correct sales recognized for certain cancelled sales orders related to buyer's remorse, which resulted in an overstatement of net sales and trade receivables, corrected an incorrect recording of supplier rebates, recorded adjustment to correct the classification of certain balance sheet reclassifications between long- and short-term assets, recorded adjustments to correct a misstatement of an accrual related to a duplicate recording of a vendor invoice for freight charges and the misstatement of inventory related to partial returned good, recorded adjustments to recognize the impact on current and deferred income taxes of all of the identified misstatements, and corrected the presentation on the statement of cash flows related to purchases not yet paid for at period end.

6. The 2023 10-K/A also addressed Lovesac's internal controls, which the Company had previously described as effective. The Company stated that management had reassessed its evaluation of the effectiveness of the Company's internal control over financial reporting and concluded that material weaknesses existed during the fiscal year 2023 and the first quarter of the 2024 fiscal year and internal control was not effective. Specifically, the Company stated that there were material weaknesses caused by an ineffective control environment resulting from a lack of a sufficient number of professionals with appropriate accounting skills and the Company's failure to maintain appropriate oversight and monitoring activities and responsibilities in pursuit of its financial reporting objectives and promote, monitor or enforce appropriate accounting policies and procedures. The specific deficient controls related to 1) journal entries operated by competent personnel to identify and correct, in a timely manner, erroneous manual journal entries, and 2) the

shipping accrual process. Lovesac noted that high turnover in the accounting department was a particular contributing factor.

7. Indeed, former Lovesac employees describe a chaotic accounting function with constant turnover that had no ability to maintain any semblance of effective internal controls.

8. Also on November 2, 2023, Lovesac filed an amendment to the 1Q24 10-Q with the SEC ("1Q24 10-Q/A"), restating its financial results for the first quarter of the 2024 fiscal year.[3] The Company restated its financial results for the first quarter of 2024 for the same items as the 2023 fiscal year financial statements, as well as to record an adjustment to recognize additional equity based compensation expense related to a one-time retention bonus granted to its CEO in March 2023.

9. As the direct and proximate result of Defendants' knowing or reckless wrongdoing, Plaintiff and other Class members suffered damages.

## II. JURISDICTION AND VENUE

10. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

11. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

12. Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as the alleged misstatements entered the securities markets from this District and the subsequent damages took place in this District. Lovesac's primary executive offices are located in this District.

[3] Together, the 2023 10-K/A and 1Q24 10-Q/A are the "Restatement."

13. In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, and the facilities of the national securities exchange.

## III. PARTIES

14. Lead Plaintiff, Susan Cooke Peña, as set forth in its previously filed PSLRA Certification (Dkt. No. 23-2), acquired Lovesac common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of Defendants' fraud.

15. Defendant Lovesac is a Delaware corporation with principal executive offices located at Two Landmark Square, Suite 300, Stamford, Connecticut 06901. Lovesac's common stock trades in an efficient market on the NASDAQ Stock Market ("NASDAQ") under the ticker symbol "LOVE."

16. Defendant Shawn Nelson ("Nelson") has served as Lovesac's Chief Executive Officer at all relevant times.

17. Defendant Donna Dellomo ("Dellomo") served as Lovesac's Executive Vice President and Chief Financial Officer from before the start of the Class Period to June 30, 2023.

18. Defendants Nelson and Dellomo (together, "Individual Defendants") each:

a. directly participated in the management of the Company;

b. was directly involved in the day-to-day operations of the Company at the highest levels;

c. was privy to confidential proprietary information concerning the Company and its business and operations;

d. was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

e. was directly or indirectly involved in the oversight or implementation of the Company's internal controls

f. was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company;

g. approved or ratified these statements in violation of the federal securities laws; and

h. signed false Sarbanes-Oxley Act of 2002 ("SOX") certifications.

## IV. SUBSTANTIVE ALLEGATIONS

### A. Lovesac's Finance Function Was Chaotic with No Effective Internal Controls, Resulting in Inaccurate Reporting

#### 1. Background

19. Lovesac is a direct-to-consumer specialty furniture brand. It maintains retail locations including Lovesac branded showrooms, mobile concierge, and pop-up shops within Costco and Best Buy stores, to support its ecommerce delivery model. Lovesac began trading publicly after an initial public offering on NASDAQ in 2018. Lovesac describes itself as a "disruptive" retail/direct to consumer brand that focuses on a "mid-luxury" market. Its products include sofas and beanbag chairs. It markets itself as capable of quick shipping (as compared to traditional furniture retailers).

20. While Lovesac has consistently touted its focus on growth, it has also identified the management of that growth as a risk in the context of internal controls. For example, the Company's 2023 10-K warned:

> ***If we fail to manage our growth effectively, our business, financial condition, operating results and prospects could be harmed.***
>
> ….
>
> [T]he growth of our business places significant demands on our operations, as well as our management and other employees. The growth of our business may require significant additional resources to meet these daily requirements, which may not

> scale in a cost-effective manner or may negatively affect the quality of our sites and customer experience. We are also required to manage relationships with a growing number of suppliers, customers and other third parties across the world. Our information technology systems and our internal controls and procedures may not be adequate to support future growth of our supplier and employee base. Failure to manage our growth and organizational change effectively could lead us to over-invest or under-invest in technology and operations; result in weaknesses in our infrastructure, systems or controls; give rise to operational mistakes, losses or loss of productivity or business opportunities; reduce customer satisfaction; limit our ability to respond to competitive pressures; and result in loss of employees and reduced productivity of remaining employees. If we are unable to manage the growth of our organization effectively, our business, financial condition and operating results may be materially adversely affected.

21. Before and during the Class Period, Lovesac's employees described a chaotic accounting function with constant turnover that did not maintain effective internal controls.

**2. Confidential Witnesses**

22. Five former Lovesac employees in diverse functions described experiences with the Company's finance function that reflected chaos, inconsistency, lack of engagement, and even outright theft. In addition to being common knowledge across Lovesac employees, these problems, and their impact on the finance function's ability to maintain effective internal controls, were known to the Individual Defendants. Indeed, two of the Company's former employees recalled speaking directly with Defendant Dellomo about inconsistencies and problems within the finance function.

23. Confidential Witness 1 ("CW1") was a project manager at Lovesac from November 2019 to 2024, working on the development of new products at the Company. CW1 reported to three different supervisors during her tenure at Lovesac: Dave Underwood, Vice President of Product Development, then Curtis Strong, Director of Product Development, then Kylie William, Director of Commercialization.

24. Confidential Witness 2 ("CW2") was a senior accountant at Lovesac from June 2019 to June 2023. CW2 worked in the accounting division, which consisted of CW2 and the

accounting manager, and was part of the larger finance function. During CW2's tenure at Lovesac, he reported at various times to the accounting manager, the controller, Defendant Dellomo, and the financial planning and analysis manager (who also filled the accounting manager role).

25. Confidential Witness 3 ("CW3") was the brand activation specialist at Lovesac from May 2021 to January 2023. CW3 reported to brand activation manager Carly Galett. CW3's role included sending invoices that the brand activation team received from vendors to the accounts payable team.

26. Confidential Witness 4 ("CW4") began her employment at Lovesac in 2010 working in a showroom. CW4 then worked her way up through a variety of roles, including showroom manager, senior customer service manager, and senior manager of business development, before becoming director of customer channel marketing in July 2020. In that role, CW4 reported to Patrick Santangelo, senior vice president of brand, and Charlie Tubb, vice president of customer channel marketing. CW4 held that position until leaving the Company in July 2023.

27. Confidential Witness 5 ("CW5") worked at Lovesac as a District Manager from May 2022 to August 2023. CW5 was located in Sacramento, California and managed 16 stores in Northern California and Nevada. CW5 reported to Regional Manager David Moss.

### 3. The Confidential Witnesses Described, and Lovesac Admitted, That the Finance Function Was Characterized by Turnover, Disorganization, and Chaos

28. CW2 explained that Lovesac's finance function was comprised of four units: accounting, financial planning and analysis ("FP&A"), accounts payable, and loss prevention and cash application. As the senior accountant, his responsibilities included managing all prepaid accounts, mixed asset accounts, and tangible asset accounts, reviewing accounts payable entries to ensure accuracy, processing all credit card fraud claims and chargebacks, and managing the

compilation of SEC reporting, which included compiling the documents and submitting them.

29. As a member of the finance function, CW2 witnessed constant turnover and reorganization. When CW2 started at Lovesac in June 2019, he reported to the accounting manager. He then began reporting directly to the controller, who subsequently left the company. For a few months after that, CW2 reported directly to Defendant Dellomo. Then the FP&A manager began fulfilling both the FP&A and accounting manager roles, above CW2. After that, the Company brought in another accounting manager and a new controller. Then that accounting manager left and was replaced. Next, that new controller left the Company and was replaced. CW2 stated that he believed the turnover in the accounting department was due to workload and constantly shifting expectations and processes, particularly with respect to who would have ownership of various financial and accounting data.

30. For example, one of CW2's responsibilities was compiling financial information from sales at the end of each month. Lovesac had a wholesale business that included third-party vendors through which the company sold products, such as Costco and Best Buy. Lovesac had an agreed upon commission structure with those companies. The companies would collect sales information through their own point of sale systems, then transfer Lovesac the money from the sales less their commissions. But in some months, the companies had only paid Lovesac for transactions though the 28th day, and any sales from last days of the month were not yet captured. CW2 would have to calculate what withholdings were going to be for those two days to close out the financial month. But the responsibility for providing CW2 with the withholding information constantly changed. Defendant Dellomo was not just aware of this inconsistency, but perpetuated it herself. Some months, CW2 recalled, Defendant Dellomo directed him to get the numbers or put the data together himself. Other months, she told him to get the numbers from the Business

Development Department.

31. CW2 recalled that the process for preparing financial reports included extracting information from the general ledger and Lovesac's profit and loss statement, putting the data together, reviewing it against the backup support compiled throughout the month, and sending it to the Company's auditors at Deloitte. The auditors would then complete their review and send their recommendations back, and there was then communication between Lovesac and the auditors over necessary changes until all of the data was determined to be accurate. After the final preparation was complete, it would be sent back to the auditors for quality control review before final sign-off. CW2 stated that the final sign-off on financial statements had four tiers: the board of directors, the CFO (during the Class Period, Defendant Dellomo), legal counsel, and the auditors. Then the Company disclosed its financial statements, including in SEC filings.

32. The Company's accounts payable processes, however, impacted CW2's ability to timely prepare financial statements. CW2 described Lovesac's accounts payable processes as "absolutely horrific." Invoices took a long time to be paid, and the department would input payments into the accounting system after the books were closed out, changing things in the system weeks after a financial period closed. As a result, by the time financial statements reached the CFO level of review, the raw data had often changed, and the statements would have to be changed. This is precisely the kind of disorganized and chaotic process that results in Lovesac's admitted failure to record unpaid last mile freight expenses and the errors with its methodology to calculate the accrual of last mile freight expenses.

33. CW2 was not the only employee to see inaccurate or delayed work by the accounts payable department. CW3 was in charge of sending invoices her team received from vendors to the accounts payable team. She described that process as "a hot mess," recalling sending invoices

but payments not being fulfilled. It often took vendors an excessive amount of time to be paid. These problems are also of the same kind that would result in Lovesac's failure to accurately record accrued expenses, including last mile freight expenses.

34. CW5 also described serious problems in the accounts payable function. CW5 recalled that in approximately late 2022, during the 2023 fiscal year, senior vice president of retail Chad Best, who reported directly to Defendant Nelson, got the Company's district managers together on a conference call and told them that employees in the accounts payable department had been stealing by siphoning Company money into their personal accounts instead of paying Lovesac's bills. Best told the district managers that the employees involved had all been terminated. CW5 stated that the theft had such a tremendous impact on the company that the district managers were asked to increase top line sales by millions of dollars in order to cover the loss.

35. Prior to this call, CW5's district was having problems with utility and rent bills not being paid for their store locations. CW5 stated that at least three stores in her district had the power shut off for nonpayment. She also recalled instances in which store landlords threatened eviction for nonpayment of rent. She also noted that the Company's Valley Fair store in Santa Clara, California, the highest volume location in the district, had its telephone service shut off for almost a week due to nonpayment. Even after those staff who were stealing were caught and terminated, however, CW5 recalled that some problems like this continued.

36. CW5 stated that her only way to communicate with the accounts payable function was to email a general accounts payable email box. When she used this email box to report problems such as past due rent payments, business license payments, and garbage payments, she

only received general acknowledgements that her emails had been received, and never received any explanation of why payments were late or not made at all.

37. CW4, the Company's director of customer channel marketing, bluntly stated that her team had to do the finance team's job because the finance team seemed to be unable to do basic functions, such as reconciling returns and invoices with Costco. Indeed, CW4's team had to fill both the finance and customer service functions for the Company's relationships with Costco and Best Buy. CW4 discussed the finance team's inability to carry out its job with Defendant Dellomo, but nothing was ever resolved.

38. Like CW2, CW4 also recalled that the finance team was unable to close out books at the end of the month. She specifically recalled that in approximately the spring of 2021, the finance team decided to write off $350,000 because they were so far behind in reconciling transactions from CW4's team.

39. CW4 recalled that for several years in a row, the finance team had the lowest engagement scores of any department in the company. CW4 explained that Lovesac distributed annual employee engagement surveys. The surveys were anonymous, but asked employees for their departments. The questions were both quantitative and qualitative, and included questions asking how invested employees were in their work, whether they felt supported by management, and if they had the tools to do their jobs, with room for staff to provide written feedback and observations. From these surveys, departments were given engagement scores, which attempt to quantify employee motivation and productivity. The engagement scores produced by these surveys were on a 100-point percentage scale. Once a year, Dora Thagouras, the Company's vice president of human relations ("HR") from September 2018 to May 2023, would announce the results of the survey during one of the Company's weekly Tuesday meetings. CW4 recalled that the finance

team had the lowest engagement scores in the Company for two to four years in a row. CW4 remembered that the finance team's score was in the 20s during that time period. By contrast, the HR team scored in the 90s and CW4's team scored in the 80s.

40. CW1 and CW2 both recalled that last mile freight expenses—the reported reason for the Company's restatement of its financial reports for the 2023 fiscal year and the first quarter of the 2024 fiscal year—were the responsibility of the supply chain function. CW2 explained that the inventory department and the logistics department, which both fell under the larger supply chain umbrella, worked together on last mile freight expenses. CW1 recalled that some people seemed to understand "last mile" to mean different things, and there was no consistent guidance from the Company's leadership on the correct definition. This inconsistency relates directly to Lovesac's failure to properly accrue last mile shipping expenses.

41. The chaos, inconsistency, and lack of engagement of Lovesac's finance team rendered it incapable of maintaining effective internal controls over financial reporting. These problems were well known throughout the Company, and in particular to Defendant Dellomo, who supervised the team and saw its inability to carry out its job.

42. Indeed, Lovesac eventually admitted as much, stating in the 2023 10-K/A that high turnover in the accounting department was a particular contributing factor to its internal control weaknesses.

**B. Lovesac Violated GAAP by Improperly Accounting for Shipping Expenses**

43. GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. The SEC Rules and interpretive releases and the Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") represent sources of authoritative GAAP for SEC registrants. (ASC 105-10-05-1) Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that

financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210.10-01(a).

44. Accounting Standards Codification ("ASC") topic 606, Revenue from Contracts with Customers, is the authoritative standard which governs accounting for revenue recognition and cost of sales. ASC 606 requires an entity to accrue (i.e., record an expense and related liability) the cost of shipping and handling activities when the entity elects to account for shipping and handling as activities to fulfill the promise to transfer the good and the shipping and handling activities are performed after a customer obtains control of the good:

> An entity that promises a good to a customer also might perform shipping and handling activities related to that good. If the shipping and handling activities are performed before the customer obtains control of the good … , then the shipping and handling activities are not a promised service to the customer. Rather, shipping and handling are activities to fulfill the entity's promise to transfer the good. ASC 606-10-25-18A
>
> If shipping and handling activities are performed after a customer obtains control of the good, then the entity may elect to account for shipping and handling as activities to fulfill the promise to transfer the good. The entity shall apply this accounting policy election consistently to similar types of transactions. An entity that makes this election would not evaluate whether shipping and handling activities are promised services to its customers. ***If revenue is recognized for the related good before the shipping and handling activities occur, the related costs of those shipping and handling activities shall be accrued.*** … [Emphasis added.] ASC 606-10-25-18B

45. In the 2023 10-K, Lovesac disclosed that it recognized the cost of shipping and handling expenses, including last mile shipping to its customers, as fulfillment activities (rather than a promised good or service) when the activities are performed. Accordingly, it recorded the

expenses for shipping and handling activities at the same time as it recognized revenue. The Company was therefore required by GAAP, but failed, to accrue the cost of these activities.

46. The Audit Committee's investigation has since revealed that during the first quarter of the 2024 fiscal year, Lovesac improperly capitalized as inventory (i.e., recorded as an asset rather than expense) $2.2 million of last mile shipping expenses which related to the 2023 fiscal year. It appears that when the Company discovered the unrecorded last mile freight expenses totaling $2.2 million during the first quarter of fiscal year 2024, it chose to capitalize these expenses rather than amending its fiscal year 2023 financial statements, thus misstating the financial statements for both periods.

47. The investigation also revealed that the Company had been applying an incorrect methodology for estimating its last mile shipping expenses, which resulted in a misstatement of it historic financial statements:

> In June 2023, the Audit Committee (the "Audit Committee") of the Board of Directors of The Lovesac Company (the "Company") commenced an internal investigation related to the recording of last mile shipping expenses, resulting from the discovery of a recorded journal entry in the quarter ended April 30, 2023 to capitalize $2.2 million of shipping expenses that related to the fiscal year ended January 29, 2023. In addition to the aforementioned journal entry, the Company has identified through the investigation certain errors with the methodology used by the Company to calculate the accrual of its last mile freight expenses applicable to the Company's financial statements for the fiscal year ended January 29, 2023 and the thirteen weeks ended April 30, 2023 (the "Prior Financial Statements").[4]
>
> * * *
>
> The Audit Committee of the Board of Directors of Lovesac completed an independent investigation in August 2023 whereby the Company concluded $2.2 million of last mile shipping expenses relating to the fiscal year ended January 29, 2023 were improperly capitalized during the quarter ended April 30, 2023. Through this investigation, the Company also determined that the methodology used to estimate an accrual of last mile freight expenses at each period end was not accurate

[4] August 16, 2023, Form 8-K.

> because the calculation did not use the correct number of shipments that were accepted by the shipper for delivery, but not yet invoiced to the Company. …[5]
>
> * * *
>
> The Audit Committee of the Board of Directors of Lovesac completed an independent investigation in August 2023 whereby the Company concluded $2.2 million of last mile shipping expenses relating to the fiscal year ended January 29, 2023 were improperly capitalized during the quarter ended April 30, 2023. Through this investigation, the Company also determined that the methodology used to estimate an accrual of last mile freight expenses at each period end was not accurate because the calculation did not use the correct number of shipments that were accepted by the shipper for delivery, but not yet invoiced to the Company. …
>
> The Company recorded adjustments [in Q1FY2024] to correct misstatements identified from the internal investigation related to last mile freight expenses. The result of the investigation concluded an inappropriately recorded journal entry increased inventory by $2.2 million related to shipping expense pertaining to fiscal 2023, and also concluded the methodology used to estimate last mile freight accrual was incorrect.[6]

48. Companies routinely make accruals for uninvoiced expenses. An accrual, or accrued expense, is a means of recording an expense that was incurred in one accounting period but not paid until a future accounting period. Accruals differ from accounts payable transactions in that an invoice is usually not yet received and entered into the system before the year end. Recording an accrual ensures that the transaction is recognized in the accounting period when it was incurred, rather than paid. This is a requirement of GAAP-based accounting and provides a more accurate and up-to-date view of an entity's financial position than the cash- basis accounting method, in which expenses are recorded when paid.

49. Lovesac's misstatement of last mile shipping expenses had the following effect on Lovesac's income statements:[7]

---

[5] 2023 Form 10-K/A, pages 6 – 7.

[6] 1Q24 10-Q/A, pages 6 – 7.

[7] This schedule is based on information provided in the 2023 Form 10-K/A and the 1Q24 10-Q/A.

| (in millions, except per share amounts) | FY2022 1/30/2022 | Q1FY2023 5/1/2022 | Q2FY2023 7/31/2022 | Q3FY2023 10/30/2022 | FY2023 1/29/2023 | Q1FY2024 4/30/2023 | Total FY22 - Q1FY24 |
|---|---|---|---|---|---|---|---|
| | | | Over / (under) stated by | | | | |
| Net sales | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Gross profit | (0.2) | 0.1 | 0.9 | (0.4) | 1.5 | 0.3 | 1.6 |
| Operating income (loss) | (0.2) | 0.1 | 0.9 | (0.4) | 1.5 | 0.3 | 1.6 |
| Net income (loss) | $ (0.2) | $ 0.1 | $ 0.6 | $ (0.3) | $ 1.3 | $ 0.3 | $ 1.4 |
| Diluted EPS | $ (0.01) | $ 0.01 | $ 0.04 | $ (0.02) | $ 0.08 | $ 0.02 | $ 0.09 |

### C. Lovesac Improperly Accounted for Leases

50. ASC Topic 842 is the current authoritative accounting standard which governs accounting for leases. The core principle of ASC 842 is that at the commencement date of a lease, a lessee (the entity leasing the asset) has a financial obligation to make lease payments to the lessor in exchange for its right to use the underlying asset, and accordingly the lessee should recognize a right-of-use ("ROU") asset and a lease liability for these rights and obligations. Therefore, on the lease commencement date, a lessee is required to measure and record a lease liability equal to the present value of the remaining lease payments, discounted using the rate implicit in the lease (or if that rate cannot be readily determined, the lessee's incremental borrowing rate). ASC 842-20-30.

51. Incremental Borrowing Rate is the rate of interest that a lessee would have to pay to borrow on a collateralized basis over a similar term an amount equal to the lease payments in a similar economic environment. ASC 842-10-20. Lease payments used in measuring the lease liability are amounts due to the lessor excluding any payments that a lessee makes at or before lease commencement. ASC 842-20-30. The ROU asset is typically amortized on a straight-line basis to the earlier of the end of its useful life or lease term and the lease liability is increased to

reflect accrued interest, using the effective interest method, and decreased for lease payments made. ASC 842-20-35-3, ASC 842-20-55-29 – 30, and ASC 842-20-55-43 – 46.

52. The FASB provides lessees with a practical expedient not to recognize short-term leases on balance sheet. ASC 842-20-25-2. A short-term lease is a lease with a term of 12 months or less, which does not include a lessee purchase option that is reasonably certain of exercise. ASC 842-10-20. If a lessee chooses to elect this short-term lease measurement and recognition exemption, it should recognize the lease payments in net income on a straight-line basis over the lease term. Variable lease payments should be recorded in the period in which the obligation for the payment is incurred. ASC 842-20-25-2.

53. Lovesac adopted ASC 842 in fiscal 2022 and elected the practical expedient for short-term leases:

> *The following new accounting pronouncements were adopted in fiscal 2022:*
>
> In February 2016, FASB issued ASU No. 2016-02, Leases (Topic 842) ("ASC 842") amending lease guidance to increase transparency and comparability among organizations by recognizing lease assets and lease liabilities on the balance sheet and disclosing key information about leasing arrangements. ASU No. 2020-05 extended the effective date to fiscal years beginning after December 15, 2021, and interim periods within fiscal years beginning after December 15, 2021, with early adoption permitted. The Company adopted the guidance in fiscal 2022 and there was not a material effect on the Company's consolidated results of operations.
>
> Adoption of this standard resulted in the recognition of operating lease right-to-use ("ROU") assets and corresponding lease liabilities of approximately $90 million and $97 million, respectively, and reclassification of deferred rent of $6.7 million as a reduction of the right-of-use assets on the consolidated balance sheet as of February 1, 2021. The new standard also provides practical expedients for an entity's ongoing accounting. The Company elected the short-term lease recognition exemption for all leases that qualify. This means, for those leases that qualify, The Company will not recognize ROU assets or lease liabilities, and this includes not recognizing ROU assets or lease liabilities for existing short-term leases of those

assets in transition. The Company also elected the practical expedient to not separate lease and non-lease components for all of our leases.[8]

54. Lovesac's disclosed accounting policy for accounting for operating leases complied with GAAP:

***OPERATING LEASES***

During Fiscal 2022, the Company adopted ASU No. 2016-02, Leases (Topic 842), see NEW ACCOUNTING PRONOUNCEMENTS section of Note 1.

The Company determines if a long-term contractual obligation is a lease at inception. The majority of our operating leases relate to company showrooms. We also lease our corporate facilities. These operating leases expire at various dates through fiscal 2032. Showroom leases may include options that allow us to extend the lease term beyond the initial base period, subject to terms agreed upon at lease inception. Some leases also include early termination options, which can be exercised under specific conditions. Our lease agreements do not contain any material residual value guarantees or material restrictive covenants.

The Company records lease liabilities at the present value of the lease payments not yet paid, discounted at the rate of interest that the Company would have to pay to borrow on a collateralized basis over a similar term. As the Company's leases do not provide an implicit interest rate, the Company uses an incremental borrowing rate based on the information available at commencement date in determining the present value of lease payments.

We recognize operating lease cost over the estimated term of the lease, which includes options to extend lease terms that are reasonably certain of being exercised, starting when possession of the property is taken from the landlord, which normally includes a construction period prior to the showroom opening. When a lease contains a predetermined fixed escalation of the fixed rent, we recognize the related operating lease cost on a straight-line basis over the lease term. In addition, certain of our lease agreements include variable lease payments, such as payments based on a percentage of sales that are in excess of a predetermined level and/or increases based on a change in the consumer price index or fair market value. These variable lease payments are excluded from minimum lease payments and are included in the determination of net lease cost when it is probable that the expense has been incurred and the amount can be reasonably estimated. If an operating lease asset is impaired, the remaining operating lease asset will be amortized on a straight-line basis over the remaining lease term.[9]

---

[8] 2022 form 10-K, page F-19.

[9] 2022 Form 10-K, page F17. A similar disclosure was made in the 2023 Form 10-K, page F-16.

55. However, as it later admitted in the 2023 10-K/A, Lovesac improperly accounted for its operating leases beginning in 2022 in violation of ASC 842:

> In the fiscal year 2022, the Company recorded an incorrect entry that resulted in the double-counting of rent expense associated with operating leases, with a corresponding impact on prepaid rent and lease liabilities as of January 30, 2022. In addition, the Company recorded an incorrect entry pertaining to incremental borrowing rate that resulted in misstatements associated with operating leases, with a corresponding impact on prepaid rent, right-of-use assets, and the current and long-term portion of operating lease liabilities, as of and during the fiscal year ended January 29, 2023.

56. In addition, during the first quarter of the 2024 fiscal year, Lovesac failed to record an embedded lease entered into during the quarter because the Company had considered the lease to be immaterial:

> The Company recorded adjustments to correct certain misstatements related to its operating leases. In the fiscal year 2022, the Company recorded an incorrect entry that resulted in the double-counting of rent expense associated with operating leases, with a corresponding impact on prepaid rent and lease liabilities as of January 30, 2022. In addition, the Company reversed the out of period correction of an incorrect entry pertaining to incremental borrowing rate that had been corrected for in the Annual Report on Form 10-K/A for the fiscal year ended January 29, 2023. This entry had an impact on prepaid rent, right-of-use assets, and the current and long-term portion of operating lease liabilities, as of and during the fiscal year ended January 29, 2023. The Company also recorded the effects of an embedded lease entered into during the quarter that was previously identified and considered immaterial.[10]

57. Lovesac's improper accounting for leases had the following effect on its income statements: [11]

---

[10] 1Q24 10-Q/A, page 7.

[11] This schedule is based on information provided in the 2023 Form 10-K/A and the 1Q24 10-Q/A.

| (in millions, except per share amounts) | FY2022 1/30/2022 | Q1FY2023 5/1/2022 | Q2FY2023 7/31/2022 | Q3FY2023 10/30/2022 | FY2023 1/29/2023 | Q1FY2024 4/30/2023 | Total FY22 - Q1FY24 |
|---|---|---|---|---|---|---|---|
| | | | | Over / (under) stated by | | | |
| Net sales | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Gross profit | - | - | - | - | - | - | - |
| Operating income (loss) | (2.0) | - | (0.1) | (0.1) | (0.1) | 0.1 | (2.0) |
| Net income (loss) | $ (1.5) | $ - | $ (0.1) | $ (0.1) | $ (0.1) | $ 0.1 | $ (1.5) |
| Diluted EPS | $ (0.09) | $ - | $ (0.01) | $ (0.01) | $ (0.01) | $ 0.01 | $ (0.09) |

### D. Lovesac Improperly Recognized Revenue

58. ASC topic 606, Revenue from Contracts with Customers, is the authoritative standard which governs revenue recognition. The core principle of the guidance included in ASC 606 is that revenue recognized by an entity should depict the transfer of promised goods or services to customers in an amount that reflects the consideration (i.e., the selling price) to which the entity expects to be entitled in exchange for those goods or services. ASC 606-10-05-3. An entity is required to recognize revenue in accordance with the following five steps:

Step 1: Identify the contract with a customer.

Step 2: Identify performance obligations in the contract.

Step 3: Determine the transaction price.

Step 4: Allocate the transaction price to the performance obligations in the contract.

Step 5: Recognize revenue when (or as) the performance obligation is satisfied.

ASC 606-10-05-4.

59. ASC 606 prohibits revenue recognition unless a contract with a customer meets all of the following criteria:[12]

[12] An entity may still recognize revenue if it received non-refundable consideration from a customer and one or more of the following has occurred: (a) it has no remaining obligations to

a. The parties to the contract have approved the contract (in writing, orally, or in accordance with other customary business practices) and are committed to perform their respective obligations.

b. The entity can identify each party's rights regarding the goods or services to be transferred.

c. The entity can identify the payment terms for the goods or services to be transferred.

d. The contract has commercial substance (that is, the risk, timing, or amount of the entity's future cash flows is expected to change as a result of the contract).

e. It is probable that the entity will collect substantially all of the consideration to which it will be entitled in exchange for the goods or services that will be transferred to the customer.

ASC 606-10-25-1.

60. ASC 606 prohibits revenue recognition unless an entity transfers promised goods or services (that is, an asset) to its customer, which occurs when the customer obtains control of the asset. ASC 606-10-25-23. Indicators of transfer of control include the following:

a. The entity has a present right to payment for the asset.

b. The customer has legal title to the asset.

c. The entity has transferred physical possession of the asset, however, physical possession may not coincide with control of an asset. For example, in a consignment arrangements, a customer or consignee may have physical possession of an asset that the entity controls. Conversely, in some bill-and-hold arrangements, the entity may have physical possession of an asset that the customer controls.

d. The customer has the significant risks and rewards of ownership of the asset.

e. The customer has accepted the asset.

ASC 606-10-25-30.

---

transfer goods or services to the customer, (b) contract with the customer has been terminated, or (c) the entity has transferred control of goods or services to the customer and has no further obligation to do so. ASC 606-10-25-7.

61. Lovesac's disclosed accounting policy for revenue recognition complied with GAAP. However, the Company has since admitted to violating GAAP and its own accounting policy during the 2023 fiscal year by recognizing revenues on certain canceled sales orders:

> The Company recorded an adjustment to correct certain canceled sales orders related to buyer's remorse, which resulted in an overstatement of net revenue and trade receivables as of and for the fiscal year ended January 29, 2023. The Company defines buyer's remorse as a customer who cancels an order within a short window of time after making a purchase.[13]

62. Moreover, it appears that when the Company discovered the improperly recorded revenues, it chose to record a reversal of these improperly recognized revenues as an increase in the general and administrative expenses for the first quarter of fiscal year 2024, rather than amending its fiscal year 2023 financial statements, thus misstating the financial statements for both periods:

> The Company recorded an adjustment to correct certain canceled sales orders related to buyer's remorse, which related to fiscal 2023 and ***was incorrectly reflected as an increase to Selling, General and Administrative Expense for the thirteen weeks ended April 30, 2023.*** The Company defines buyer's remorse as a customer who cancels an order within a short window of time after making a purchase. [14]

(Emphasis added.)

63. The improperly recognized revenues had the following impact on Lovesac's income statements: [15]

---

[13] 2023 Form 10-K/A, page F-20.

[14] 1Q24 10-Q/A, page 7.

[15] This schedule is based on information provided in the 2023 Form 10-K/A and the 1Q24 10-Q/A.

| (in millions, except per share amounts) | FY2023 1/29/2023 | Q1FY2024 4/30/2023 | Total FY23 - Q1FY24 |
|---|---|---|---|
| | Over / (under) stated by | | |
| Net sales | $ 0.4 | $ - | $ 0.4 |
| Gross profit | 0.4 | - | 0.4 |
| Operating income (loss) | 0.4 | (0.4) | - |
| Net income (loss) | $ 0.3 | $ (0.4) | $ (0.1) |
| Diluted EPS | $ 0.02 | $ (0.03) | $ (0.01) |

**E. Lovesac Improperly Accounted for Inventory and Cost of Goods Sold**

64. Regulation S-X requires companies to disclose in their financial statements the costs and expenses applicable to sales and revenues, including cost of tangible goods sold (i.e., inventory sold), cost of services, and expenses applicable to other revenues. 17 CFR § 210.5-03.

65. A major objective of accounting for inventories is the proper determination of income through the process of matching appropriate costs against revenues. ASC 330-10-10-1. Inventory includes items held for sale in the ordinary course of business. ASC 330-10-20. The primary basis of accounting for inventories is cost, which has been defined generally as the price paid or consideration given to acquire an asset. Inventory costs include the sum of all expenditures and charges incurred in bringing an article to its existing condition and location. ASC 330-10-30-1.

66. GAAP requires vendor rebates to be recognized as a reduction in the cost of sales, based on a systematic and rational allocation, when such rebates can be reasonably estimated and their receipt is probable. When a rebate is not probable and cannot be reasonably estimated, it

should be recognized as a reduction of the cost of goods sold as the milestones for earning the rebate are achieved. ASC 705-20-25-10.

67. Lovesac has admitted to improperly accounting for vendor rebates during the second and third quarters of fiscal year 2023, which resulted in understatement of cost of merchandize sold during the second quarter of fiscal year 2023, overstatement of merchandise inventories as of July 31, 2022 (the end of the second quarter of fiscal year 2023), and overstatement of cost of merchandize sold during the third quarter of fiscal year 2023 by $0.9 million in each period, respectively:[16]

> During the quarter ended July 31, 2022, the Company received rebates from certain of its suppliers which was incorrectly recorded to cost of goods sold for the entire amount of the rebate received instead of deferring a portion of the rebate to inventory and recognizing the rebate in cost of goods sold as the related inventory was sold. We corrected these misstatements to defer the up-front consideration from suppliers when the retention or receipt of that consideration was to recognize the consideration as a reduction of cost of goods sold over the sell through rate of the inventory.[17]

68. In addition to improperly recording vendor rebates, Lovesac also misstated its financial statements due to an accrual related to a duplicate recording of a vendor invoice for freight charges. The Company also misstated inventory due to improper accounting for partially returned goods:

> The Company recorded adjustments to correct for a misstatement of an accrual related to a duplicate recording of a vendor invoice for freight charges. The Company recorded another adjustment to correct for the misstatement of inventory related to partial returned goods.[18]

---

[16] See 2023 Form 10-K/A, pages F-44 – F-46, and F-39.

[17] *Id.*, page F-20.

[18] 2023 Form 10-K/A, page F-20.

69. The impact of the misstatements related to errors in the Company's accounting for vendor rebates, inventory, and cost of goods sold on its income statements are summarized below: [19]

| (in millions, except per share amounts) | Q2FY2023 7/31/2022 | Q3FY2023 10/30/2022 | FY2023 1/29/2023 | Q1FY2024 4/30/2023 | Total FY22 - Q1FY24 |
|---|---|---|---|---|---|
| | | | Over / (under) stated by | | |
| Net sales | $ - | $ - | $ - | $ - | $ - |
| Gross profit | 0.9 | (0.9) | 0.3 | (0.2) | 0.1 |
| Operating income (loss) | 0.9 | (0.9) | 0.3 | (0.2) | 0.1 |
| Net income (loss) | $ 0.6 | $ (0.6) | $ 0.3 | $ (0.2) | $ 0.1 |
| Diluted EPS | $ 0.04 | $ (0.04) | $ 0.02 | $ (0.01) | $ 0.01 |

## F. Lovesac Improperly Classified Cash Flows

70. The statement of cash flows is a central component of an entity's financial statements, it provides key information about an entity's financial health and its capacity to generate cash. The objective of a statement of cash flows is to describe the sources and uses of cash. The information provided in a statement of cash flows allows financial statement users to do all of the following:

a. Assess the entity's ability to generate positive future net cash flows.

b. Assess the entity's ability to meet its obligations, its ability to pay dividends, and its needs for external financing.

c. Assess the reasons for differences between net income and associated cash receipts and payments.

[19] This schedule is based on information provided in the 2023 Form 10-K/A and the 1Q24 10-Q/A.

d. Assess the effects on an entity's financial position of both its cash and noncash investing and financing transactions during the period.

ASC 230-10-10-2.

71. Cash flows are classified in the statement of cash flows as either operating, financing or investing activities, depending on their nature. ASC 230-10-45-24. ASC Topic 230, *Statement of Cash Flows*, provides guidance on reporting cash flows in an entity's financial statements:

> "Investing activities include making and collecting loans and acquiring and disposing of debt or equity instruments and property, plant, and equipment and other productive assets, that is, assets held for or used in the production of goods or services by the entity (other than materials that are part of the entity's inventory)." ASC 230-10-20.
>
> "Financing activities include obtaining resources from owners and providing them with a return on, and a return of, their investment; … borrowing money and repaying amounts borrowed, or otherwise settling the obligation; and obtaining and paying for other resources obtained from creditors on long-term credit." ASC 230-10-20.
>
> "Operating activities include all transactions and other events that are not defined as investing or financing activities … . Operating activities generally involve producing and delivering goods and providing services. Cash flows from operating activities are generally the cash effects of transactions and other events that enter into the determination of net income." ASC 230-10-20.

72. In other words, cash flows from operating activities is the residual category in the cash flow statement. If a cash inflow (receipt) or outflow (payment) does not result from an investing or financing activity, it is classified as operating. Ideally, a company's cash from operating activities should routinely exceed its net income because a positive cash flow speaks to a company's ability to remain solvent and grow its operations.

73. Lovesac has admitted that it incorrectly classified the cash flow presentation related to purchases of property and equipment and patents and trademarks not yet paid for at each period end, which overstated the reported cash flows provided by operating activities in the 2022 fiscal

year and understated the year-to-date (not the quarterly) cash flows used in operating activities during the first through third quarters of fiscal year 2023 follows: [20]

| (amounts in $000s) | | FY2022<br>Year Ended<br>January 30, 2022 | | Q1FY2023<br>Thirteen Weeks<br>Ended<br>May 1, 2022 | | Q2FY2023<br>Twenty-Six<br>Weeks Ended<br>July 31, 2022 | | Q3FY2023<br>Thirty-Nine<br>Weeks Ended<br>October 30, 2022 |
|---|---|---|---|---|---|---|---|---|
| Net cash provided by (used in) operating activities | | | | | | | | |
| Originally reported | $ | 34,018 | $ | (21,786) | $ | (59,354) | $ | (65,142) |
| Adjustment | | (1,370) | | (1,541) | | (3,536) | | (3,244) |
| Restated/Revised | $ | 32,648 | $ | (23,327) | $ | (62,890) | $ | (68,386) |
| *(Over)/understated by* | | *-4.20%* | | *6.61%* | | *5.62%* | | *4.74%* |
| Net cash (used in) provided by investing activities | | | | | | | | |
| Originally reported | $ | (16,488) | $ | (6,018) | $ | (13,661) | $ | (21,559) |
| Adjustment | | 1,370 | | 1,541 | | 3,536 | | 3,244 |
| Restated/Revised | $ | (15,118) | $ | (4,477) | $ | (10,125) | $ | (18,315) |
| *(Over)/understated by* | | *-9.06%* | | *-34.42%* | | *-34.92%* | | *-17.71%* |

## G. Restatement and Materiality

74. GAAP requires any error in the financial statements of a prior period discovered after the financial statements are issued to be reported as an error correction by restating the prior-period financial statements and providing description of the nature of the error and its effect on the financial statements. ASC 250-10-45-23 and ASC 250-10-50-7.

75. ASC 250 distinguishes errors from accounting changes and defines an error as "an error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of generally accepted accounting principles (GAAP), or oversight or misuse of facts that existed at the time the financial statements were prepared. A change from an accounting principle that is not generally accepted to one that is generally accepted is a correction of an error." ASC 250-10-20 – Glossary.

[20] This schedule is based on information provided in the 2023 Form 10-K/A and the 1Q24 10-Q/A.

76. ASC 250 states that if a company must correct a prior period error, it should do so by restating the prior-period financial statements including the following:

> a. The cumulative effect of the error on periods prior to those presented shall be reflected in the carrying amounts of assets and liabilities as of the beginning of the first period presented.
>
> b. An offsetting adjustment, if any, shall be made to the opening balance of retained earnings (or other appropriate components of equity or net assets in the statement of financial position) for that period.
>
> c. Financial statements for each individual prior period presented shall be adjusted to reflect correction of the period-specific effects of the error.

ASC 250-10-45-23.

77. ASC 250 further requires disclosure that "previously issued financial statements have been restated, along with a description of the nature of the error", including "the effect of the correction on each financial statement line item… for each prior period presented" and "the cumulative effect of the change on retained earnings …as of the beginning of the earliest period presented." ASC 250-10-50-7.

78. Because GAAP does not apply to immaterial items (ASC 105-10-05-6), a restatement is required only for items deemed to be material.

79. In addition, Item 4.02 of Form 8-K requires specific disclosures when "the registrant's board of directors …concludes that any previously issued financial statements …should no longer be relied upon because of an error in such financial statements."

80. FASB's Statements of Financial Accounting Concepts No. 8 ("CON 8") states the following:

> The omission or misstatement of an item in a financial report is material if, in light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item.

CON 8 ¶ QC11.

81. SEC Staff Accounting Bulletins No. 99 and No. 108 ("SAB 99" and "SAB 108") offer the most comprehensive guidance on the determination of materiality of misstatements of financial statements. SAB 99 brings together guidance from financial accounting standards, auditing standards, and decisions of the United States Supreme Court. SAB 99 addresses misstatements or omission of amounts, classifications, manner of presentation and disclosures in financial statements. SAB 99 provides that the materiality assessment must be based on consideration of all relevant circumstances or the "total mix" of information, including the size of the misstatement and the context in which the user of the financial statements would view the item. SAB 99 sets forth the SEC Staff's view that there are circumstances in which misstatements below a percentage threshold (e.g., 5 percent) could be material.

> Among the considerations that may well render material a quantitatively small misstatement of a financial statement item are –
>
> - whether the misstatement arises from an item capable of precise measurement or whether it arises from an estimate and, if so, the degree of imprecision inherent in the estimate
> - whether the misstatement masks a change in earnings or other trends
> - whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise
> - whether the misstatement changes a loss into income or vice versa
> - whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability
> - whether the misstatement affects the registrant's compliance with regulatory requirements
> - whether the misstatement affects the registrant's compliance with loan covenants or other contractual requirements
> - whether the misstatement has the effect of increasing management's compensation – for example, by satisfying requirements for the award of bonuses or other forms of incentive compensation

- whether the misstatement involves concealment of an unlawful transaction.

82. With respect to intentional misstatements of financial statements to manage reported earnings, SAB 99 states that even small misstatements are likely to be regarded as significant by financial statement users:

> … the staff believes that a registrant and the auditors of its financial statements should not assume that even small intentional misstatements in financial statements, for example those pursuant to actions to "manage" earnings, are immaterial. While the intent of management does not render a misstatement material, it may provide significant evidence of materiality. The evidence may be particularly compelling where management has intentionally misstated items in the financial statements to "manage" reported earnings. In that instance, it presumably has done so believing that the resulting amounts and trends would be significant to users of the registrant's financial statements. The staff believes that investors generally would regard as significant a management practice to over- or under-state earnings up to an amount just short of a percentage threshold in order to "manage" earnings. Investors presumably also would regard as significant an accounting practice that, in essence, rendered all earnings figures subject to a management-directed margin of misstatement.

(Footnotes omitted.)

83. SAB 108 requires materiality considerations to include an evaluation of the current period misstatements, as well as the effect of the misstatements accumulated from prior periods and, when necessary, correcting the prior periods' financial statements in order to keep the current period financial statements from being misleading.

84. In summary, the evaluation of whether a misstatement or omission in financial statements is material is viewed from the standpoint of a reasonable investor and the likelihood that a misstatement or omission would have significantly altered decisions of the investor, considering the circumstances, including both quantitative and qualitative factors, and the nature of the item and its location within the financial statements. By announcing that a restatement was necessary, the Company admitted that its 2023 and first quarter 2024 financial statements were materially misstated.

### H. Lovesac's Ineffective Internal Controls Over Financial Reporting

85. As detailed below, even as they disclosed other internal control problems, Defendants omitted from their disclosures to investors that the Company lacked internal controls over financial reporting. Accurate disclosures concerning internal controls are material to investors.

86. The Committee of Sponsoring Organizations of the Treadway Commission (COSO) Internal Control—Integrated Framework ("Framework") was originally issued in 1992 and refreshed in 2013. The Framework was developed as guidance to help improve confidence in all types of data and information.

87. The Framework sets forth three categories of objectives, which allow organizations to focus on separate aspects of internal control:

- *Operations Objectives*—These pertain to effectiveness and efficiency of the entity's operations, including operational and financial performance goals, and safeguarding assets against loss.
- *Reporting Objectives*—These pertain to internal and external financial and non-financial reporting and may encompass reliability, timeliness, transparency, or other terms as set forth by regulators, standard setters, or the entity's policies.
- *Compliance Objectives*—These pertain to adherence to laws and regulations to which the entity is subject.

88. Management, with board oversight, sets entity-level objectives that align with the entity's mission, vision, and strategies. Management and the board of directors establish goals and targets toward the achievement of objectives that by their nature create pressures within the organization. Excessive pressures are most commonly associated with:

- Unrealistic performance targets, particularly for short-term results;
- Conflicting objectives of different stakeholders;

- Imbalance between rewards for short-term financial performance and those for long-term focused stakeholders, such as corporate sustainability goals.

For example, pressure to generate sales levels that are not commensurate with market opportunities can lead sales managers to falsify numbers or engage in bribery or other illicit acts.

89. Setting objectives is a prerequisite to internal control and a key part of the management process relating to strategic planning.

90. COSO defines internal control as "a process, effected by an entity's board of directors, management, and other personnel, designed to provide reasonable assurance regarding the achievement of objectives relating to operations, reporting, and compliance."

91. Internal control is not one event or circumstance, but a dynamic and iterative process— actions that permeate an entity's activities and that are inherent in the way management runs the entity. Embedded within this process are controls consisting of policies and procedures. These policies reflect management or board statements of what should be done to effect internal control. Such statements may be documented, explicitly stated in other management communications, or implied through management actions and decisions. Procedures consist of actions that implement a policy.

92. Internal control is effected by the board of directors, management, and other personnel. It is accomplished by the people of an organization, by what they do and say. The board and senior management establish the tone for the organization concerning the importance of internal control and the expected standards of conduct across the entity. The board of directors and senior management establish the tone at the top regarding the importance of internal control including expected standards of conduct. Management reinforces expectations at the various levels of the organization. The resulting control environment has a pervasive impact on the overall system of internal control.

93. Tone is impacted by the operating style and personal conduct of management and the board of directors, attitudes toward risk, and positions, which may be conservative or aggressive (e.g., position on estimates, policy choices), and degree of formality (e.g., in a smaller family business, controls may be more informal), all of which sends a message to the organization. Personal indiscretion, lack of receptiveness to bad news, or unfairly balanced compensation practices could impact the culture and ultimately provide an incentive for inappropriate conduct. In contrast, a history of ethical and responsible behavior by management and the board of directors and demonstrated commitment to addressing misconduct send strong messages in support of integrity. Employees are likely to develop the same attitudes about right and wrong—and about risks and controls—as those shown by management. Individual behavior is often influenced by the knowledge that the chief executive officer has behaved ethically when faced with a tough business-based or personal decision, and that all managers have taken timely action to address misconduct.

94. Tone at the top and throughout the organization is fundamental to the functioning of an internal control system. Without a strong tone at the top to support a strong culture of internal control, awareness of risk can be undermined, responses to risks may be inappropriate, control activities may be ill defined or not followed, information and communication may falter, and feedback from monitoring activities may not be heard or acted upon.

95. The board of directors ultimately holds the chief executive officer accountable for understanding the risks faced by the entity and establishing the requisite system of internal control to support the achievement of the entity’s objectives. The chief executive officer and senior management, in turn, are responsible for designing, implementing, conducting, and periodically assessing the structures, authorities, and responsibilities needed to establish accountability for internal control at all levels of the organization.

96. In its 2022 Form 10-K, Lovesac disclosed that its disclosure controls and procedures as well as internal control over financial reporting were not effective as of January 30, 2022 due to a material weakness related to information technology general controls in the areas of user access and segregation of duties related to certain information technology systems that supported the Company's financial reporting process. Notwithstanding that weakness, the Company stated that its management had concluded that its financial statements were prepared in accordance with GAAP and fairly presented, in all material respects, Lovesac's financial position, results of operations and cash flows. The Company also noted that it was in the process of remediating the material weakness that it disclosed.

97. Although, beginning with the financial report that it filed on Form 10-Q for the first quarter of fiscal year 2023, the Company represented that it had successfully implemented a remediation plan to address the material weakness in its internal control over financial reporting identified during as of January 30, 2022, it still continued to maintain that its disclosure controls and procedures were not effective at the end of each of the first three quarters of fiscal year 2023 "[s]olely as a result of this material weakness."[21]

98. Then, in its 2023 Form 10-K, the Company represented that it had remediated the prior material weakness and that its management had assessed its disclosure controls and procedures as well as internal control over financial reporting to be effective as of January 29, 2023. The Company's remediation activities purportedly included enhancing its information technology compliance and accounting functions with additional experienced hires, including a new Chief Information Officer.[22]

---

[21] Q1, Q2, and Q3FY2023 Forms 10-Q, Item 4. Controls and Procedures.

[22] 2023 Form 10-K, pages 21 and 39.

99. As the CWs recall, the Lovesac finance function's dysfunction was common knowledge at the Company. Indeed, even after direct reports to Defendant Dellomo about problems, nothing changed. In the Restatement, the Company acknowledged that its assessment of the effectiveness of the internal control over financial reporting as of January 29, 2023 was false and that an undisclosed material weaknesses in the internal control over financial reporting existed during fiscal year 2023 and the first quarter of fiscal year 2024.

## I. False and Misleading Statements During the Class Period

100. The Class Period begins on June 8, 2022, when Lovesac issued a press release announcing financial results for the first quarter of fiscal year 2023, which ended May 1, 2022. On the same day, Lovesac filed its Form 10-Q with the SEC reporting its financial and operational results for the quarter ended May 1, 2022 (the "1Q23 10-Q"). Defendants Nelson and Dellomo signed the 1Q23 10-Q, appending their signed SOX certifications attesting to the accuracy of the financial statements and that all fraud and significant deficiencies and material weaknesses in internal controls were disclosed.

101. The June 8, 2022, press release and the 1Q23 10-Q included several materially false and misleading financial disclosures. The Company reported that gross profit was $66.1 million, its operating income was $2.6 million, net income was $1.9 million, and its net income per diluted share was $0.12. The Company reported on its balance sheet $210.2 million in total current assets, $366.6 million in total assets, $103.8 million in total current liabilities, $207.3 million in total liabilities, and $159.3 million in stockholder equity. The Company reported on its statement of cash flows net cash used in operating activities of $21.8 million and net cash used in investing activities of $6.0 million.

102. The foregoing disclosures were materially false and misleading. In violation of GAAP, Defendants knew and/or recklessly disregarded that they had improperly accounted for,

among others, shipping expenses, leases, improperly classified certain long-term assets as short-term assets on the balance sheet, and improperly presented purchases of property and equipment and patents and trademarks not yet paid for at period end on the statement of cash flows. In fact, the Company's gross profit was $66.0 million, its operating income was $2.5 million, net income was $1.8 million, net income per diluted share was $0.11, total current assets were $206.2 million, total assets were $363.6 million, total current liabilities were $99.4 million, total liabilities were $202.9 million, stockholder equity was $160.7 million, net cash used in operating activities was $23.3 million and net cash used in investing activities was $4.5 million.

103. The 1Q23 10-Q additionally stated during the thirteen weeks ended May 1, 2022, the Company had successfully implemented a remediation plan to address the material weakness related to information technology general controls in the areas of user access and segregation of duties related to certain information technology systems that supported the Company's financial reporting process that it had identified in 2022 10-K. The 1Q23 10-Q stated that there were no other material changes in its internal control over financial reporting during the thirteen weeks ended May 1, 2022.

104. The foregoing statement was materially false and misleading. Defendants knew and/or recklessly disregarded that Lovesac did not have effective internal control over financial reporting as of May 1, 2022 due to a chaotic finance function that failed to properly account for numerous types of income and expenses, including shipping and handling expenses and leases and failed to prepare GAAP compliant financial statements.

105. On September 8, 2022, Lovesac announced its second quarter 2023 financial results in a press release. On September 9, 2022, Lovesac filed its Form 10-Q with the SEC reporting its financial and operational results for the quarter ended July 31, 2022 ("2Q23 10-Q"). Defendants

Nelson and Dellomo signed the 2Q23 10-Q, appending their signed SOX certifications attesting to the accuracy of the financial statements and that all fraud and significant deficiencies and material weaknesses in internal controls were disclosed.

106. The September 8, 2022, press release and the 2Q23 10-Q included several materially false and misleading financial disclosures. The Company reported that gross profit was $80.9 million, its operating income was $9.9 million, net income was $7.1 million, and its net income per diluted share was $0.45. The Company reported on its balance sheet $209.3 million in total current assets, $373.9 million in total assets, $98.0 million in total current liabilities, $207.9 million in total liabilities, $166 million in stockholder equity. The Company reported on its statement of cash flows net cash used in operating activities of $59.4 million and net cash used in investing activities of $13.7 million.[23]

107. The foregoing disclosures were materially false and misleading. In violation of GAAP, Defendants knew and/or recklessly disregarded that they had improperly accounted for, among others, shipping expenses, leases, and inventory and cost of goods sold, improperly classified certain long-term assets as short-term assets on the balance sheet, and improperly presented purchases of property and equipment and patents and trademarks not yet paid for at period end on the statement of cash flows. In fact, the Company's gross profit was $79.1 million, its operating income was $8.1 million, net income was $5.8 million, net income per diluted share was $0.37, total current assets were $203.6 million, total assets were $368.9 million, total current liabilities were $92.8 million, total liabilities were $202.7 million, stockholder equity was $166.2

[23] The amounts reported on the statement of cash flows were for the twenty-six weeks ended July 31, 2022.

million, net cash used in operating activities was $62.9 million, and net cash used in investing activities was $10.1 million.[24]

108. The 2Q23 10-Q additionally stated during the twenty-six weeks ended July 31, 2022, the Company had successfully implemented a remediation plan to address the material weakness related to information technology general controls in the areas of user access and segregation of duties related to certain information technology systems that supported the Company's financial reporting process that it had identified in 2022 10-K. The 2Q23 10-Q stated that there were no other material changes in its internal control over financial reporting during the thirteen weeks ended July 31, 2022.

109. The foregoing statement was materially false and misleading. Defendants knew and/or recklessly disregarded that Lovesac did not have effective internal control over financial reporting as of July 31, 2022 due to a chaotic finance function that failed to properly account for numerous types of income and expenses, including shipping and handling expenses, leases, inventory and cost of goods sold, and failed to prepare GAAP compliant financial statements.

110. On December 7, 2022, Lovesac announced its third quarter 2023 financial results in a press release. On December 8, 2022, Lovesac filed its Form 10-Q with the SEC reporting its financial and operational results for the quarter ended October 30, 2022 ("3Q23 10-Q"). Defendants Nelson and Dellomo signed the 3Q23 10-Q, appending their signed SOX certifications attesting to the accuracy of the financial statements and that all fraud and significant deficiencies and material weaknesses in internal controls were disclosed.

---

[24] The amounts reported on the statement of cash flows were for the twenty-six weeks ended July 31, 2022.

111. The December 7, 2022, press release and the 3Q23 10-Q included several materially false and misleading financial disclosures. The Company reported that gross profit was $63.6 million, loss from operations was $11.6 million, net loss was $8.4 million, and its net loss per diluted share was $0.55. The Company reported on its balance sheet $215.5 million in total current assets, $407.4 million in total assets, $119.0 million in total current liabilities, $249.2 million in total liabilities, and $158.2 million in stockholder equity. The Company reported on its statement of cash flows net cash used in operating activities of $65.1 million and net cash used in investing activities of $21.6 million.[25]

112. The foregoing disclosures were materially false and misleading. In violation of GAAP, Defendants knew and/or recklessly disregarded that they had improperly accounted for, among others, shipping expenses, leases, and inventory and cost of goods sold, improperly classified certain long-term assets as short-term assets on the balance sheet, and improperly presented purchases of property and equipment and patents and trademarks not yet paid for at period end on the statement of cash flows. In fact, the Company's gross profit was $64.9 million, loss from operations was $10.1 million, net loss was $7.4 million, net loss per diluted share was $0.48, total current assets were $209.2 million, total assets were $401.0 million, total current liabilities were $111.4 million, total liabilities were $241.6 million, stockholder equity was $159.4 million, net cash used in operating activities was $68.4 million, and net cash used in investing activities was $18.3 million.[26]

[25] The amounts reported on the statement of cash flows were for the thirty-nine weeks ended October 30, 2022.

[26] The amounts reported on the statement of cash flows were for the thirty-nine weeks ended October 30, 2022.

113. The 3Q23 10-Q additionally stated during the thirty-nine weeks ended October 30, 2022, the Company had successfully implemented a remediation plan to address the material weakness related to information technology general controls in the areas of user access and segregation of duties related to certain information technology systems that supported the Company's financial reporting process that it had identified in 2022 10-K. The 2Q23 10-Q stated that there were no other material changes in its internal control over financial reporting during the thirteen weeks ended October 30, 2022.

114. The foregoing statement was materially false and misleading. Defendants knew and/or recklessly disregarded that Lovesac did not have effective internal control over financial reporting as of October 30, 2022 due to a chaotic finance function that failed to properly account for numerous types of income and expenses, including shipping and handling expenses, leases, inventory and cost of goods sold, and failed to prepare GAAP compliant financial statements.

115. On March 28, 2023, Lovesac issued a press release announcing financial results for the quarter and year ended January 29, 2023. The next day, Lovesac filed its 2023 Form 10-K with the SEC. Defendants Nelson and Dellomo signed the 2023 Form 10-K, appending their signed SOX certifications attesting to the accuracy of the financial statements and that all fraud and significant deficiencies and material weaknesses in internal controls were disclosed.

116. The March 28, 2023 press release and the 2023 Form 10-K included several materially false and misleading financial disclosures. In particular, March 28, 2023 press release reported that for the thirteen weeks ended January 29, 2023, the Company's net sales were $238.8 million, its gross profit was $135.2 million, its operating income was $38.1 million, its net income was $27.6 million, and its net income per diluted share was $1.74. Both, the March 28, 2023 press release and the 2023 Form 10-K reported that for the year ended January 29, 2023, the Company's

net sales were $651.5 million, its gross profit was $345.8 million, its operating income was $39 million, its net income was $28.2 million, and its net income per diluted share was $1.77. The Company reported on its balance sheet $418.1 million in total assets, $224.8 million in total liabilities, and $193.3 million in stockholders' equity.

117. The foregoing disclosures were materially false and misleading. In violation of GAAP, Defendants knew and/or recklessly disregarded that they had improperly accounted for shipping expenses, leases, and inventory and cost of goods sold, improperly recognized revenue, and improperly classified certain long-term assets as short-term assets on the balance sheet, and improperly presented purchases of property and equipment and patents and trademarks not yet paid for at period end on the statement of cash flows. In fact, for the thirteen weeks ended January 29, 2023, the Company's net sales were $238.5 million, its gross profit was $133.7 million, its operating income was $36.5 million, its net income was $26.2 million, and its net income per diluted share was $1.65. For the 2023 fiscal year, the Company's net sales were $651.2 million, its gross profit was $343.7 million, its operating income was $37 million, its net income was $26.5 million, and its net income per diluted share was $1.66. The Company's balance sheet actually reflected $408.6 million in total assets, $215.5 million in total liabilities, and $193.1 million in stockholders' equity.

118. The 2023 Form 10-K also materially misled investors concerning the Company's disclosure controls and procedures and internal control over financial reporting, stating:

> Our management, with the participation of our Chief Executive Officer (our principal executive officer) and Chief Financial Officer (principal financial officer), has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this Annual Report. Our Chief Executive Officer and Chief Financial Officer have concluded, based on their evaluation, that our disclosure controls and procedures were effective as of January 29, 2023.

* * *

> Management assessed the effectiveness of the Company's internal control over financial reporting as of January 29, 2023. In making this assessment, management used the criteria set forth in 2013 by the Committee of Sponsoring Organizations of the Tread way Commission (COSO) in "Internal Control-Integrated Framework." Based on management's assessment using the COSO criteria, management has concluded that the Company's internal control over financial reporting was effective as of January 29, 2023.

119. The foregoing statements about Lovesac's disclosure controls and procedures and internal control over financial reporting were materially false and misleading. Lovesac did not have effective disclosure controls and procedures or internal control over financial reporting as of January 29, 2023, due to a chaotic finance function that failed to properly account for numerous types of income and expenses, including shipping and handling expenses, leases, revenues, and even employee theft during the 2023 fiscal year.

120. More, warning about ineffective internal controls, Defendants stated:

> ***If we are unable to maintain an effective system of internal controls in the future, we may fail to timely and accurately report our financial results, experience a loss of investor confidence in the accuracy and completeness of our financial statements, incur material misstatements in our financial statements, and the market price of our common stock may be adversely affected.***
>
> As a public company, we are required to maintain internal control over financial reporting and to report any material weaknesses in such internal control. Section 404 of the Sarbanes-Oxley Act ("Section 404") requires that we furnish a report by management on, among other things, the effectiveness of our internal control over financial reporting. This assessment requires disclosure of any material weaknesses identified by our management in our internal control over financial reporting. Our independent registered public accounting firm also needs to attest to the effectiveness of our internal control over financial reporting. We designed, implemented, and tested internal control over financial reporting required to comply with this obligation. The process of compiling the system and processing documentation necessary to perform the evaluation required under Section 404 is costly and challenging, and, in the future, we may not be able to complete our evaluation, testing, and any required remediation in a timely fashion.
>
> We previously identified in our Annual Report on Form 10-K for the year ended January 30, 2022 a material weakness in our internal control over financial reporting relating to ineffective information technology general controls. Although

we have remediated the prior material weakness, if we have a material weakness in our internal control over financial reporting in the future, we may not detect errors to the Company's annual or interim financial statements on a timely basis. If we identify future material weaknesses in our internal control over financial reporting or are unable to comply with the requirements of Section 404 in a timely manner or assert that our internal control over financial reporting is effective, or if our independent registered public accounting firm is unable to express an opinion or expresses a qualified or adverse opinion about the effectiveness of our internal control over financial reporting, we may experience a loss of investor confidence in the accuracy and completeness of our financial statements, incur material misstatements in our financial statements, incur difficulty accessing capital on favorable terms, or at all, be subject to fines, penalties or judgments, incur reputational harm, and the market price of our common stock may be adversely affected. In addition, we could become subject to investigations by the stock exchange on which our securities are listed, the SEC, and other regulatory authorities, which could require additional financial and management resources and materially and adversely affect our business, results of operations and financial condition.

***If our internal control over financial reporting or our disclosure controls and procedures are not effective, we may not be able to accurately report our financial results, prevent fraud or file our periodic reports in a timely manner, which may cause investors to lose confidence in our reported financial information and may lead to a decline in our stock price.***

We rely on financial reporting and data analytics that must be accurate in order to make real-time management decisions, accurately manage our cash position, and maintain adequate inventory levels while conserving adequate cash to fund operations. In the event of a systems failure, a process breakdown, the departure of key management, or fraud, we would be unable to efficiently manage these items and may experience liquidity shortfalls that our cash position or revolving credit facility may not be able to accommodate. In such a situation, we also may not be able to accurately report our financial results, prevent fraud or file our periodic reports in a timely manner, which may cause investors to lose confidence in our reported financial information and may lead to a decline in our stock price.

121. The foregoing risk warning about Lovesac's internal controls over financial reporting was materially false and misleading. Defendants omitted that the Company already lacked internal controls over financial reporting due to a chaotic finance function that failed to properly account for numerous types of income and expenses, including shipping and handling expenses, leases, revenues, and even employee theft during the 2023 fiscal year.

122. On June 7, 2023, Lovesac announced its first quarter 2024 financial results in a press release. On June 9, 2023, Lovesac filed its 1Q24 10-Q with the SEC. Defendants Nelson and Dellomo signed the 1Q24 10-Q, appending their signed SOX certifications attesting to the accuracy of the financial statements and that all fraud and significant deficiencies and material weaknesses in internal controls were disclosed.

123. The June 7, 2023 press release and the 1Q24 10-Q included several materially false and misleading financial disclosures. The Company reported that cost of merchandise sold was $70.5 million, gross profit was $70.7 million, total operating expenses were $76.5 million, loss from operations was $5.8 million, net loss was $4.2 million, net loss per diluted share was $0.28, total current assets were $187.7 million, total assets were $428.1 million, total liabilities were $238.8 million, and total stockholders' equity was $189.3 million.

124. The foregoing disclosures were materially false and misleading. In violation of GAAP, Defendants knew and/or recklessly disregarded that they had improperly accounted for, among others, shipping expenses, leases, and inventory and cost of goods sold, equity based compensation expense, and improperly classified certain long-term assets as short-term assets on the balance sheet. In fact, cost of merchandise sold was $70.6 million, gross profit was $70.6 million, total operating expenses were $76.3 million, loss from operations was $5.7 million, net loss was $4.1 million, net loss per diluted share was $0.27, total current assets were $181.5 million, total assets were$421.3 million, total liabilities were$232 million, and total stockholders' equity was $189.2 million.

125. The 1Q24 10-Q additionally stated that there were no changes in the Company's internal control over financial reporting during the thirteen weeks ended April 30, 2023 that had materially affected, or were likely to materially affect, its internal control over financial reporting.

126. Because Defendants had previously misled investors concerning the Company's internal controls over financial reporting in its 2023 Form 10-K, this disclosure was also materially false and misleading. Lovesac did not have effective internal control over financial reporting as of April 30, 2023, due to a chaotic finance function that failed to properly account for numerous types of income and expenses, including shipping and handling expenses, leases, revenues, and even employee theft during the previous fiscal year.

**J. The Truth Emerges**

127. On August 16, 2023, after the market closed, Lovesac disclosed in a current report on Form 8-K that investors should no longer rely on management's report on internal control over financial reporting for the fiscal year ended January 29, 2023, and its previously issued financial statements contained in its 2023 Form 10-K and 1Q24 10-Q. Lovesac stated that the planned restatement was the result of an investigation that the Audit Committee had commenced resulting from the discovery of a recorded journal entry in the quarter ended April 30, 2023 to capitalize $2.2 million of shipping expenses that related to the fiscal year ended January 29, 2023. The investigation had identified errors with the methodology used by the Company to calculate the accrual of its last mile freight expenses applicable to the Company's financial statements for the fiscal year ended January 29, 2023 and the thirteen weeks ended April 30, 2023, which caused it to overstate previously reported operating income and net income. The Company also disclosed that as a result of these errors, it was likely to identify one or more material weaknesses in its internal controls over financial reporting.

128. Following these disclosures, Lovesac's stock price fell $0.70 per share, or 2.95%, to close at $23.06 per share on August 17, 2023.

129. On November 2, 2023, Lovesac filed the Restatement. In its 2023 10-K/A, Lovesac explained that the Audit Committee's investigation "concluded $2.2 million of last mile shipping

expenses relating to the fiscal year ended January 29, 2023 were improperly capitalized during the quarter ended April 30, 2023." More, "the methodology used to estimate an accrual of last mile freight expenses at each period end was not accurate because the calculation did not use the correct number of shipments that were accepted by the shipper for delivery, but not yet invoiced to the Company." Lovesac restated its financial statements to record adjustments to correct certain misstatements related to its operating leases, recorded an adjustment to correct sales recognized for certain cancelled sales orders related to buyer's remorse, which resulted in an overstatement of net sales and trade receivables, corrected an incorrect recording of supplier rebates, recorded adjustment to correct the classification of certain balance sheet reclassifications between long- and short-term assets, recorded adjustments to correct a misstatement of an accrual related to a duplicate recording of a vendor invoice for freight charges and the misstatement of inventory related to partial returned good, recorded an adjustment to its equity based compensation expense, recorded adjustments to recognize the impact on current and deferred income taxes of all of the identified misstatements, and corrected the presentation on the statement of cash flows related to purchases not yet paid for at period end.

130. The 2023 10-K/A also admitted that material weaknesses existed in the Company's internal controls over financial reporting during the fiscal year 2023 and the first quarter of the 2024 fiscal year, rendering them ineffective. Specifically, the Company stated that there were material weaknesses caused by an ineffective control environment resulting from a lack of a sufficient number of professionals with appropriate accounting skills and the Company's failure to maintain appropriate oversight and monitoring activities and responsibilities in pursuit of its financial reporting objectives and promote, monitor or enforce appropriate accounting policies and procedures. The specific deficient controls related to 1) journal entries operated by competent

personnel to identify and correct, in a timely manner, erroneous manual journal entries, and 2) the shipping accrual process. Lovesac admitted that high turnover in the accounting department was a particular contributing factor.

131. Also on November 2, 2023, Lovesac filed the 1Q24 10-Q/A, restating its financial results for the first quarter of the 2024 fiscal year.

## V. PLAINTIFF'S CLASS ACTION ALLEGATIONS

132. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the Class, consisting of all those who purchased or otherwise acquired the publicly traded common stock of Lovesac during the Class Period, and who were damaged thereby. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

133. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's common stock actively traded on Nasdaq. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action using the form of notice similar to that customarily used in securities class actions.

134. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

135. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

136. Common questions of law and fact exist as to all members of the Class predominate over any questions solely affecting individual members. Among the questions of law and fact common to the Class are:

a. whether Defendants' acts as alleged violated the federal securities laws;

b. whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

c. whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d. whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

e. whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

f. whether the prices of the Company's common stock during the Class Period was artificially inflated because of the Defendants' conduct complained of herein; and

g. whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

137. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the

damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VI. APPLICATION OF PRESUMPTION OF RELIANCE; FRAUD ON THE MARKET

138. Plaintiff will rely on the presumption of reliance established by the fraud on the market doctrine. At all relevant times, the market for Lovesac's common stock was open, well-developed, and efficient. As a result of Defendants' materially false and/or misleading statements and/or failures to disclose, Lovesac's common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired the Company's common stock relying upon the integrity of the market price of Lovesac's common stock and market information relating to Lovesac, and have been damaged thereby.

139. During the Class Period, the artificial inflation of Lovesac's stock was caused by the material misrepresentations and/or omissions particularized in this Amended Complaint, causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Lovesac's internal controls and financial results. These material misstatements and/or omissions created an unrealistically positive assessment of Lovesac and its business, operations, and revenue, thus causing the price of the Company's common stock to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company's common stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at such artificially inflated prices, and each of them has been damaged as a result.

140. At all relevant times, the market for Lovesac's common stock was an efficient market for the following reasons, among others:

a. Lovesac common stock met the requirements for listing, and was listed and actively traded on the Nasdaq, a highly efficient and automated market;

b. As a regulated issuer, Lovesac filed periodic public reports with the SEC and/or the Nasdaq;

c. Lovesac regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

d. Lovesac was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

e. Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

141. As a result of the foregoing, the market for Lovesac's common stock promptly digested current information regarding Lovesac from all publicly available sources and reflected such information in Lovesac's stock price. Under these circumstances, all purchasers of Lovesac's common stock during the Class Period suffered similar injury through their purchase of Lovesac's common stock at artificially inflated prices and a presumption of reliance applies.

142. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial results and prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## VII. COUNTS

### COUNT I

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Against All Defendants

143. Plaintiff repeats and reallege each and every allegation contained above as if fully set forth herein.

144. This Count is asserted against each of the Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

145. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Lovesac's common stock at artificially inflated prices. In

furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

146. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Lovesac's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

147. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Lovesac's business operations and financial results and prospects, as specified herein.

148. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Lovesac's revenue, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Lovesac and its business operations and financial results and prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

149. Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's revenue recognition practices, financial results, and reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

150. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Lovesac's actual business operation practices and revenues from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's revenues and business operations throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

151. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Lovesac's common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Lovesac's common stock during the Class Period at artificially high prices and were damaged thereby.

152. At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding Lovesac's internal controls and their impact on its financial reports, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Lovesac common stock, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

153. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### Violation of Section 20(a) of The Exchange Act Against the Individual Defendants

154. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

155. The Individual Defendants acted as controlling persons of Lovesac within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their participation in and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

156. In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the internal control failures giving rise to the securities violations as alleged herein, and exercised the same.

157. As set forth above, Lovesac and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## IX. DEMAND FOR TRIAL BY JURY

158. Plaintiff hereby demands a trial by jury.

Dated: May 10, 2024

Respectfully submitted,

**FAXON LAW GROUP, LLC**

/s/ *Joel T. Faxon* (CT 16255)
Joel T. Faxon, Esq.
Brittany S. Cates, Esq. (CT 27106)
59 Elm Street #3
New Haven, CT 06510
Telephone: 203.624.9500
Email: jfaxon@faxonlawgroup.com
bcates@faxonlawgroup.com

*Liaison Counsel for Lead Plaintiff and the Class*

**THE ROSEN LAW FIRM, P.A.**

Jacob A. Goldberg
(*pro hac vice*)
Leah Heifetz-Li
(*pro hac vice*)
101 Greenwood Avenue
Suite 440
Jenkintown, PA 19046

Tel: (215) 600-2817
Fax: (212) 202-3827
Email: jgoldberg@rosenlegal.com
lheifetz@rosenlegal.com

*Lead Counsel for Lead Plaintiff and the Class*

**SCHALL LAW FIRM**

Brian Schall, Esq.
2049 Century Park E #2460
Los Angeles, CA 90067
Telephone: (310) 301-3335
Email: brian@schallfirm.com

*Additional Counsel*

**CERTIFICATION OF SERVICE**

I hereby certify that, on May 10, 2024, the foregoing *Amended Class Action Complaint* was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Joel T. Faxon_______________
Joel T. Faxon (ct 16255)